# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EVE ATKINSON,                              :
                                           :     CIVIL ACTION
          Plaintiff,                       :
                                           :
     v.                                    :
                                           :
LAFAYETTE COLLEGE, et al.                  :     NO. 01-2141
                                           :
          Defendants.                      :

FILED

SEP 09 2009

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MEMORANDUM

BUCKWALTER, S.J.                                      September 8, 2009

Currently pending before the Court is a Motion by Defendant Lafayette College for Summary Judgment, the Response thereto of Plaintiff Eve Atkinson, and Defendant's Reply Brief. For the following reasons, the Motion is granted and the case is dismissed in its entirety.

## I.    BACKGROUND

### A.    Statement of Facts[1]

Plaintiff, Eve Atkinson, received her bachelor and masters degrees from West Chester University, and a doctorate in education from Temple University. (Pl.'s Resp. Mot. Summ. J., Ex. V.) In November 1989, she met with Herman Kissiah, Dean of Students at Defendant Lafayette College ("Lafayette" or "the College"), in connection with an opening in the athletics department. (Def.'s Mot. Summ. J., Ex. B, Eve Atkinson Dep. ("Atkinson Dep."), 23:22-25:4,

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs, taken in the light most favorable to Plaintiff.

Nov. 22, 2002, Dec. 17, 2002, Sep. 19, 2008.)[2]  On December 28, 1989, the College hired her in

the position of Director of Athletics and Professor and Head, Physical Education and Athletics,

thereby making her the first woman appointed as athletic director in a coed Division 1-AA

program. (Id. at 84:14-19; Def.'s Mot. Summ. J., Ex. A.)  Her appointment letter stated, as

follows:

> [Lafayette College] is pleased to appoint you to the position of Director of
> Athletics and Professor and Head, Physical Education and Athletics, effective
> January 29, 1990, with term thereafter at the pleasure of the President of the
> college and the board of Trustees. It is further understood that your initial
> appointment will be through June 30, 1992, and that you would be subject to the
> procedures for due notice as apply to the faculty which would ensure you a
> minimum of one year's notice.

(Def.'s Mot. Summ. J., Ex. A.)  As Plaintiff testified, Dean Kissiah told her that "the position

was a position with faculty appointment.  It was an administrative position plus a faculty

appointment position. . . . He said the position was not offered at that time with tenure, but that it

was a faculty position and that it would be controlled by the faculty handbook." (Atkinson Dep.

54:2-22.)  Effectively, it encompassed three roles:  (1) full professor; (2) department head; and

(3) director of athletics.  (Id. at 57:16-19.)

Plaintiff was not terminated after her initial two and a half year term.  Rather, from July 1,

1990 to July 1, 2000, Plaintiff was notified, on an annual basis, of salary increases. (Def.'s Mot.

Summ. J., Ex. J.)

Part of Plaintiff's responsibility involved ensuring compliance with Title IX of the

Education Amendments of 1972, which prohibits, in part, sex discrimination under any education

---

[2]  Although Plaintiff's deposition was taken over three separate days, in three separate
years, the transcript numbers the pages of her deposition consecutively.

program or activity receiving federal financial assistance. 20 U.S.C. § 1681, *et seq.* Throughout her tenure with the College, Plaintiff was involved with Title IX issues, including advocating for both female employees and female students in the athletic programs. (Atkinson Dep. 150:8-18, 425:11-426:9, 507:12-508:1.) Part of her obligations included looking at the subject of gender equity under Title IX, ensuring that the College was in compliance with Title IX and, if it was not in compliance, "to offer remedies to resolve that." (Id. at 363:14-365:3.) As Plaintiff testified, the President of the College, Dr. Ellis, encouraged her to address issues regarding the disparities between men's and women's sports at the College. (Id. at 161:16-24.) Such encouragement was ongoing from at least 1992 through to the tenure of later President Arthur Rothkopf. (Id. at 575: 21-576:1.)

From the outset of her appointment, Plaintiff complained about gender inequities in the Department of Athletics and regularly made recommendations on Title IX issues. (Id. at 364:9- 365:3; 555:22-556:13, 572:6-576:12; Pl.'s Resp. Mot. Summ. J., Ex. J, Atkinson Aff. ("Atkinson Aff.") ¶ 8 , Feb. 18, 2003.) In the course of her almost decade-long employment, Plaintiff worked on increasing scholarships to women athletes, (id. 159:22-156:3), equitable funding of sports programs, (id. at 245:3-12), hiring full-time as opposed to part-time coaches for the women's athletic programs, (id. at 287:12-24), and ensuring equal pay for the female coaching staff. (Id. at 425:11-426:9. 507:12-20.) Patricia Fisher, the women's basketball coach and later the College's assistant athletic director, testified that Plaintiff was vocal in her advocacy for Title IX compliance and voiced her opinions openly at committee meetings. (Pl.'s Resp. Mot. Summ. J., Ex. C., Patricia Fisher Dep. ("Fisher Dep."), 22:1-23:19, Dec. 17, 2008.)

In January of 1996, Plaintiff became involved with a College self-study designed, in part,

3

to evaluate the College's efforts on gender and racial equality. (Def.'s Mot. Summ. J., Ex. C,

Leslie Muhlfelder Dep. ("Muhlfelder Dep.), 17:17-19:4, Dec. 18, 2008.) The findings were to be

presented to the National Collegiate Athletic Association ("NCAA"). (Id.) Leslie Muhlfelder,

the College's General Counsel, was appointed by President Rothkopf to chair the Subcommittee

on Commitment to Equity because of her knowledge of Title IX. (Muhlfelder Dep. 18:13-19:4;

Atkinson Dep. 632:12-633:11.)

   Although Plaintiff was not a member of the Subcommittee, she served as staff to provide

information regarding the athletics department. (Muhlfelder Dep. 20:6-21:4.) In that role, she

repeatedly raised issues of gender equality in the context of the College's athletic budget.

(Atkinson Aff. ¶ 9.) For example, in the summer of 1996, Plaintiff presented a multitude of

points to Dean Kissiah, to which he responded as follows:

> Let me pick up on a couple of items on your retreat. Clearly the program was a
> comprehensive one and covered the many issues facing our athletic program. I
> commend you for the way you've organized the department for the benefit of
> Lafayette.
>
> I do want to call your attention to a couple of minor points on which we might
> want to move slowly. I note these as follows:
>
> 1. Mission Statement - lets go slow on putting this down on parchment and
>    displaying it in the lobby. I do want approval of the Board by September
>    28 before we go widely public.
> 2. NCAA Certification - I do agree that we need to meet these deadlines and I will
>    do better this next year.
> 3. Addition of Women's Crew - I suggest we don't even bother with this one
>    at this time. I will be happy to discuss with you at some length if need be.
> 4. Hoops Pass - we can discuss later on as noted in an earlier memo to you.
> 5. Logo - Good idea. Make sure that Scott keeps Glenn fully advised and
>    that it is consistent with what Glenn wants to do with the College's overall
>    program.
> 6. Twenty Five Years of Women's Athletics - Great idea, maybe AJR
>    [President Rothkopf] will give us some money on this one.

(Pl.'s Resp. Mot. Summ. J., Ex. W.)  Further, in an October 30, 1996 memorandum from

Plaintiff to Muhlfelder, Plaintiff demonstrated her continued awareness of and advocacy for Title

IX issues:

> Listed below are the needs we feel need to be addressed by the committee and
> items of recommendations to be included in the final report of the Commitment to
> Equity Committee.  These needs are ones that we believe are necessary to enable
> the Department of Athletics and Physical Education to become more equitable
> within its entire program.
>
> 1.  Add on full-time assistant coaches of Women's Sports.
> 2.  Elevate one part-time head coach of a women's sport to full-time status.
> 3.  Hire a minority female coach(es) for a women's team(s).
> 4.  Recruitment of additional minority student-athletes for women's teams.
> 5.  Renovate locker room facilities at Kirby Field House.
> 6.  Renovate McCracken Field House for additional women's locker rooms.
> 7.  Add two additional outdoor playing fields at Metzgar for women's teams.
> 8.  Separate budget accounts for the same or like sports that have different
>     Head Coaches.
> 9.  Re-evaluate coaching positions for teams and discuss overlapping of
>     coaching and other job responsibilities.
>
> We would be available to discuss the justifications of these items with the
> committee and would be grateful for any help the committee could offer to our
> department in these areas.  Thank you for your assistance.

(Pl.'s Resp. Mot. Summ. J., Ex. E.)

The full report of the College self-study was submitted to the NCAA in fall 1997.

(Muhlfelder Dep. 21:19-24.)  It concluded that, as of June 30, 1996, the College had

demonstrated equitable treatment of men and women in various areas, but recommended

renovation of women's locker room space at Kirby House and McCracken Field House.  (Def.'s

Mot. Summ. J., Ex. D.)  In addition, the report deferred to the Gender Equity Plan developed by

Plaintiff and her staff recommending elevation of a part-time women's team coaching position to

full-time equivalency by June 30, 1999, and implementation of a long-range plan for reallocating

coaching staff and positions within the Department by June 30, 2000, to provide more full-time recruitment of female student-athletes. (Id.)

In May of 1998, the NCAA certified the College as compliant with Title IX and indicated that any Title IX plans for improvement outlined by the College had to be implemented according to the College's self-imposed deadlines. (Atkinson Dep., Ex. 30.) Additionally, the NCAA imposed several requirements that did not affect current certification, but which the College would be required to enact in order to maintain certification. (Id.) The NCAA and President Rothkopf corresponded about these latter requirements over the summer of 1998. (Id. Ex. 31.) By August 20, 1998, the NCAA conclusively determined that "the actions taken by the institution satisfy the requirement established by the committee related to reviewing the university's gender-equity plan with the goal of increasing female student-athlete opportunities." (Id.)

According to Plaintiff, her dispute with the College administration accelerated in mid-1998, when she began to push the College to expend additional funds for expanding women's athletics. (Atkinson Dep. 626:6-628:8.) Both President Rothkopf and Dean Kissiah explained that they were unwilling to allocate any more of the College's funds for athletics, and told Plaintiff that she had to work with the department's current funds to attain total Title IX compliance. (Id. at 628:9-629:18.) Accordingly, the issue, as described by Plaintiff, became not whether to be compliant with Title IX, but the source of the money necessary to achieve that compliance. (Id. at 631:24-632:22.) Plaintiff conceded that Muhlfelder, the person within the university charged with determining Title IX compliance, was supportive of Plaintiff's efforts. (Id. at 632:23-633:9.)

6

When Plaintiff's push for new funds was rejected by the administration, she attempted to reshuffle the department's existing funds and develop a plan to cut certain sports, while adding others, in order to attain further Title IX compliance measures. (Id. at 590:17-591:7; Muhlfelder Dep. 38:24-39:10; 40:8:42:5.) The resulting "Plan to Enhance the Department of Athletics and Physical Education" was approved by President Rothkopf and submitted to the Board Committee for Athletics and Student Affairs in October 1998. (Def.'s Mot. Summ. J., Ex. F, Arthur Rothkopf Dep. ("Rothkopf Dep. (2008)"), 27:11-30:16, Nov. 24, 2008.) The Plan recommended the elimination of four varsity sports – baseball, men's lacrosse, fencing, and volleyball – and four junior varsity sports – football, men's basketball, field hockey, and women's lacrosse. (Id. Ex. 58, 14.) These actions would have made approximately $172,000 available for distribution to other varsity sports, including the cost of two-full time coaching positions that would be reallocated to women's soccer and either field hockey or women's lacrosse. (Id.)

Upon review of this proposal, however, the Board of Trustees Committee on Athletics and Student Affairs decided that before approving any such changes, it should conduct a broader and more comprehensive study of the entire athletic program. (Rothkopf Dep. (2008) 33:14-34:13.) The Board indicated that it would take a hard, realistic look at the capital and operating costs of making Lafayette's athletic program competitive. (Id. at 34:14-35:7.) This study was designed to determine whether the College should maintain all of its intercollegiate athletic activities at the Division I level of the NCAA rankings, or alternatively, and pursuant to a proposal by President Rothkopf, decrease its spending on athletics by either eliminating the men's football program entirely or going down to a Division III status. (Atkinson Dep. 587:16-588:14.)

7

Plaintiff remained strongly opposed to both eliminating football and altering the

divisional status, as she felt it was not in the best interests of the College to do so in the middle of

the capital campaign. (Id. at 426:21-427:17; 588:17-589:6.)  On October 26, 1998, during the

Board study of the Athletics Department, Plaintiff called a specially-scheduled meeting with all

of the student-athletes to express her continued opposition to these alternate proposals.  At this

meeting, she stated:

> I, the senior athletic administration and coaching staff are firmly committed to
> keeping the "excellence" in the Lafayette Experience.  We are fully committed to
> fighting to have Lafayette's athletic program remain in Division I and to be
> competitive within the Patriot League.  I personally will fight this battle with
> respect and diligence until I am fired or die in the job.  I have formally expressed
> my strong viewpoints regarding retaining Division I status to the Central
> Administration.  This Division I vs. Division III battle has been on going every
> two years for the past nine years.  I am committed to fighting this battle again
> through this academic year.  But I need your help, support and we must network
> together with the faculty, administration and alumni.  We need to remain as a
> united department for getting additional resources as a Division I institution.

(Atkinson Dep., Ex. 17, A-04374-75.)  Notably, Plaintiff made no mention of any Title IX issues

in her outline for the meeting.  Neither Dean Kissiah nor President Rothkopf confronted Plaintiff

about her organized protest.  (Atkinson Aff. ¶ 17.)

Tensions between Plaintiff and College administration came to a head in November of

1998, during the course of the Board study.  The remaining dispute concerned the lack of money

to fund the athletic department as a whole, which, by its nature, encompassed funding to ensure

gender equity.  (Atkinson Dep. at 613:1-19.)  Dean Kissiah and Plaintiff had previously reviewed

projected costs of funding a co-ed Division I athletic program generally, but, during a November

18, 1998 meeting of a subcommittee of the faculty reviewing the status department, Dean Kissiah

presented inflated versions of Plaintiff's projections and numbers without ever informing

8

Plaintiff that he had changed her figures. (Id. at 169:21-170:9; 177:17-178:5; 336:1-11.) After the meeting, Plaintiff confronted him and indicated that he did not make an accurate representation to the Board since he altered figures that were presented on her behalf. (Id. at 169:21-14; 175:19-176:12.) Further, she complained that he had unfairly surprised her, in violation of the President's guidelines, by not telling her about the changed figures prior to the meeting. (Id.) According to Plaintiff, Kissiah then became very "irate," approached her and stood over her with his fist clenched and raised over her head, threatening her and trying to intimidate her. (Id. at 170:15-22.) He said things to the effect of "this is the way it will be, take it or leave it," "[y]ou want everything your way," and "I've had it up to here [raising his hand] with athletics and all of this report."[3] (Id. at 170:22-171:4.) Plaintiff felt physically threatened, intimidated, upset, and brought to the point of tears because of his unprofessional behavior. (Id. at 170:22-23, 174:1-10, 178:21-179:17.) This was the first time that Kissiah had ever acted in this way toward Plaintiff, and it never happened on any subsequent occasion. (Id. at 180:15-181:3.)

Immediately thereafter, Plaintiff reported the incident both to Muhlfelder, who also

---

[3] As noted by Defendant, Dean Kissiah denied that he ever yelled at Plaintiff with clenched fists in an effort to intimidate and harass her. (Def.'s Mot. Summ. J., Ex. G. Herman Kissiah Dep. ("Kissiah Dep."), 125:22-127:9, Dec. 31, 2002.) He indicated that they had a discussion during which she became very upset at his failure to include her numbers in his report. She commented that he would be able to retire someday and do whatever he wanted, but all she had was the athletic program at Lafayette College and he was trying to destroy it. (Id. at 127:4-128:3.) He denied ever using clenched fists and yelling at her while she was sitting down. (Id. at 128:4-129:15.)

Notwithstanding this alternate account, this Court must, on summary judgment review, take the facts in the light most favorable to Plaintiff. Accordingly, for purposes of this Motion, the Court disregards Dean Kissiah's testimony and fully accepts Plaintiff's testimony to represent the facts as they occurred.

served as the director of human resources, and to President Rothkopf. (Atkinson Dep. 172:1-14.)
Plaintiff indicated that Kissiah's behavior was unprofessional, that the President's directive
regarding not surprising people in meetings was not followed by Kissiah, and that "the whole
point was that he wasn't playing fair" by presenting documents at that meeting that he had not
shared with her prior to the meeting. (Id. at 335:2-336:19.) She wanted to "go on notice that this
was not proper professional behavior, that [she] would not subject [herself] to that again and be
emotionally upset that way again by [her] supervisor and that . . . some action should be taken."
(Id. at 337:19-338:1.) During her subsequent deposition, she stated her belief that this was
discrimination against her due to her position on the general funding of both men's and women's
sports, as follows:

> Q.    You believe you were discriminated against or retaliated against because
>       you oppose the budgetary allocations to men's and women's sports?
>
> A.    It's not opposed. It's the issue that more funding – I was very clear on
>       more funding, and the president knew this, the president knew this from
>       board meetings, the members of the board knew it from 1996 on, that
>       more money needed to be spent. It's written in the board documents and
>       the president knew that.
>
> Q.    So it had to do, however, with the funding of the men's and women's
>       programs?
>
> A.    That's correct.

(Id. at 338:24-340:5.) Despite Plaintiff's report of this incident, neither Rothkopf nor Muhlfelder
ever met with Kissiah or discussed it with him. (Kissiah Dep. 101:14-102:20.)

The day after the incident, Dean Kissiah left Plaintiff a phone message saying that he was
disappointed that their encounter was not more productive. (Atkinson Dep. 393:2-24.) During a

subsequent meeting, Plaintiff told him that she did not enjoy being treated the way he treated her, to which he responded that "this was a pressure time and, that he was under pressure and this whole study on athletics was very trying on everyone." (Id. 394:14-24.) She never raised the incident again with him. (Id. at 396:7-11.) Plaintiff agreed that everyone working on the Board study felt under pressure. (Id. at 395:11-14.)

In January of 1999, the Board completed its study and elected to both retain the College's Division I status and conduct an additional capital campaign for athletics. (Id. at 552:7-18.) As a result of the additional funding, the Board passed a resolution, on April 9, 1999, making money available for the addition of three new coaching positions:  head women's soccer coach, head women's lacrosse coach, and full-time women's softball coach, thereby putting the College, in Plaintiff's view, in full compliance with Title IX. (Id. at 553:7-555:21; 595:10-597:1.)

According to Plaintiff, subsequent to her complaints about Kissiah's actions, she was subject to various forms of purportedly retaliatory behavior designed to weaken her faculty position and tenure status. For example, in April of 1999, intramurals and recreation, a significant component of her physical education position, was taken out of her supervision. (Id. at 286:12-19.) Moreover, from January 15, 1999, until his retirement on October 31, 1999, Dean Kissiah met with President Rothkopf and raised concerns about whether Plaintiff should continue to lead the athletics department. (Kissiah Dep. 122:20-123:17.) Kissiah further indicated to Rothkopf that he had spoken with members of the football staff, field hockey program, and administrative department, who expressed concern that leadership was not taking them where they needed to go, and that morale was low based on frustration with the department's management. (Id. at 123:13-124:17.)

11

Finally, in August 1999, Kissiah prepared a detailed written evaluation of her

performance, which, in some regards, was highly complimentary, and in other regards raised

concerns about her leadership abilities.[4] Ultimately, the evaluation concluded with the following

summary:

> As Director, Eve brings to the position many strengths. She is highly organized,
> dedicated, and gives enormous amounts of time to complete the task.
> Responsibilities are complicated by the fact that the College budget does not
> permit as complete an administrative staff as is generally necessary for a program
> of this magnitude.  On the other hand, Eve's relationships with staff, both within
> and without her department, are sometimes problematic.  Her single-minded
> dedication to the Intercollegiate Athletic Program has hurt her in the eyes of other
> divisional staff who believe they give regularly of their time and effort to broader
> College programs.  Eve has enabled the College to develop a strong athletic
> schedule, although our win/loss record is not good.  The resources that have now
> been provided will "raise the ante" and more will be expected.  At the conclusion
> of my first four or five evaluations I told her to relax and quit trying to win the job
> all over again.  While one can appreciate her single-minded dedication, there are
> times when one must loosen up, listen to the comments and criticisms of others,
> and try to modify behavior.

(Pl.'s Resp. Mot. Summ. J., Ex. M.)  Upon receipt of the eleven-page evaluation, Plaintiff

responded to Dean Kissiah with a detailed letter request that he raise his final evaluation rating of

"Meets Expectations" to "Exceeds Expectations."  (Id.)  By way of memoranda dated on October

4, 1999 and October 14, 1999, Dean Kissiah declined to change his summary evaluation rating,

and indicated that both the evaluation and her comments would be forwarded to the Office of

Human Resources. (Pl.'s Resp. Mot. Summ. J., Ex. N.)

---

[4] Plaintiff claims that this was the first written evaluation she had ever received. (Pl.'s
Resp. Mot. Summ. J. 10.)  Defendant, however, points to Dean Kissiah's report, which
references his "first four or five evaluations." (Pl.'s Resp. Mot. Summ. J., Ex. M., EA-15852.)
Nonetheless, Defendant has not produced any other written evaluations from Plaintiff's
personnel file. As the Court must view the evidence in the light most favorable to Plaintiff, we
assume that the August 1999 evaluation was the first *written* evaluation for Plaintiff during her
tenure with the College.

On November 4, 1999, President Rothkopf summarily terminated Plaintiff from all of her positions with the College, effective June 30, 2001, stating that he believed that "the Athletics Department would benefit from new leadership." (Def's Mot. Summ. J., Ex. H.) Although Plaintiff asked him for more specific reasons, he never supplied any answers. (Atkinson Dep. 353:8-353:18, 360:18-361:11, 470:15-20, 510:4-511:22, 546:12-18.) Rothkopf conceded that following Plaintiff's notice of non-reappointment, he did not provide her with any writing that would have allowed her to know the full basis of his decision. (Rothkopf Dep. (2008) 59:7-13.)

After the filing of the present lawsuit, Rothkopf, upon questioning, began to articulate reasons for Plaintiff's termination. (Def's Mot. Summ. J., Ex. I, Resp. to Interrogatory 3.) Specifically, he indicated:

> [T]he termination decision was based on the conclusion that new leadership was needed in the Athletics Department. The President of the College concluded, in consultation with others, that Plaintiff was not the right person to lead the Athletics Department in the future. The President of the College believed that Plaintiff's leadership and management skills were deficient. He believed that her management style alienated others and led to poor relations and low morale in the Athletics Department and to working relationships with others in College administration that were not constructive. The President of the College also believed that Plaintiff had exercised poor judgment in a variety of situations, which lessened his confidence in her abilities. Moreover, Plaintiff's conduct during the study of athletics by the College's Board of Trustees during 1998 and into January of 1999, mentioned in the answer to interrogatory 2, diminished his confidence in her judgment and in her willingness to support his administration.

> The President consulted with the Dean of Students, Herman C. Kissiah, at various times, and with his successor in that position, James Krivoski, about the decision to issue the termination notice. They supported the termination decision. He also sought legal advice from the College's General Counsel, Leslie Muhlfelder. The Executive Committee of the Board of Trustees were informed of this decision on various occasions.

(Id.) Moreover, in Response to Interrogatory Two, Rothkopf indicated:

Plaintiff's leadership and management skills were deficient.  Plaintiff did not have a constructive working relationship with numerous people at the College.  Her management style contributed to poor relations and low morale among personnel in the Athletics Department and poor working relationships with individuals working in other divisions in the College.

Plaintiff exercised poor judgment in a variety of ways.  This includes, for example, the matter identified in the first four "bullets" under the heading Teamwork and Communication in her performance evaluation in 1999, and in connection with the matter of the President's approval or instructions mentioned in the note dated January 19, 1999. . . . Plaintiff also acted inappropriately by fomenting opposition to possible changes to the College's intercollegiate athletics program that were under consideration by the Board of Trustees during 1998 and into the beginning of 1999.  Her actions undermined the College's ability to conduct a reasoned study as called for by the Board.  Also, Plaintiff at times would not follow the instructions of her supervisor James Krivoski.

(Id. at Resp. to Interrogatory 2.)

Similarly, in deposition testimony, both Rothkopf and Kissiah offered insight into the basis for Plaintiff's termination. Rothkopf indicated that Plaintiff had become insubordinate, after the Board of Trustees announced that it wanted to conduct a dispassionate study of the College's athletic program, by organizing a group of student athletes to oppose any changes in the College's athletic program and to effectively protest any dropping of sports or change in the status of the College's division. (Rothkopf Dep. (2008) 41:17-42:11.)  He considered her to be going beyond what was appropriate for an employee of the college.  (Id. at 42:11-15.) Additionally, Rothkopf cited various conversations he had had with other individuals in the College's community in which they expressed their concerns about Plaintiff's management style. (Id. at 67:3-69:13.)

Moreover, Dean Kissiah testified that President Rothkopf expressed concern about Plaintiff's efforts to end-run Kissiah's authority.  (Kissiah Dep. 87:8-88:5.)  Kissiah also stated

that he spoke with members of the football staff, head coach of the field hockey program, and several administrative officers – all of whom reported low morale and poor leadership. (Id. at 123:18-124:11, 135:8-136:18, 162:1-8.)

Even after her non-reappointment, Plaintiff continued to press for the College's Title IX compliance. (Pl's Resp. Mot. Summ. J., Exs. P, Q, R.) President Rothkopf assumed that she would do so "because that was part of her responsibility." (Rothkopf Dep. (2008) 59:15-20.) New gender equity goals were both planned and implemented past the date of Plaintiff's termination. (Pl.'s Resp. Mot. Summ. J., Ex. S (Gender Equity Plan revised on July 6, 2000), Ex. T (Draft Gender Equity Plan dated May 7, 2002).)[5]

## B.    Procedural History

Plaintiff filed a complaint under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. 951, *et seq.*, on May 2, 2000. The complaint challenged her termination and the denial of both her tenure status and requested faculty appeals. See Atkinson v. Lafayette, 460 F.3d 447, 451 (3d Cir. 2008) (setting forth procedural history). In particular, she claimed that she was terminated and denied a faculty appeals because of her gender and the College's pattern and practice of discharging qualified female employees – a practice to which similarly situated males had not been subject. Id. She did not allege retaliation in this complaint, which was also filed with the federal Equal Employment Opportunity Commission ("EEOC"). Id.

Subsequently, in responding to an EEOC questionnaire concerning her employment

---

[5] In prior discussions of this case, the parties focused on events occurring after her termination, with regard to whether she was entitled to a hearing before the faculty tenure review appeals committee. As all of the counts involving these facts have been dismissed on summary judgment by this Court, and as the decision has been affirmed by the Third Circuit Court of Appeals, the Court declines to rehash these facts.

claim, Plaintiff asserted that the basis for her discharge was sex, retaliation, and age. Id. As to the retaliation claim, she specified that her notice of termination was retaliation against her for her insistence that Title IX anti-discrimination law be followed or, in other words, that equal funding and personnel be given to both women's and men's sports programs. Id.

Plaintiff initiated the current federal action on May 1, 2001, alleging: (1) gender discrimination and retaliation under Title VII and the PHRA (Counts I and II); (2) retaliation in violation of Title IX (Count III); and (3) breach of contract (Count IV). Upon consideration of Defendants' Motion to Dismiss, this Court granted the motion as to Atkinson's claims of breach of contract and Title VII claims against President Rothkopf, individually. The Court further dismissed her retaliation claim under Title IX, finding no private right of action to enforce such claims, pursuant to Alexander v. Sandoval, 532 U.S. 275 (2001). Atkinson v. Lafayette College, Civ. A. No. 01-2141, 2002 WL 123449 (E.D. Jan. 29, 2002). Subsequently, this Court granted Defendants' Motion for Summary Judgment as to all of Plaintiff's remaining counts. Atkinson v. Lafayette College, Civ. A. No. 01-2141, 2003 WL 21956416 (E.D. Pa. Jul. 24, 2003).

Plaintiff appealed to the United States Court of Appeals for the Third Circuit, which affirmed all of this Court's previous rulings, save for the dismissal of Plaintiff's Title IX retaliation claim. Atkinson v. Lafayette College, 460 F.3d 447 (3d Cir. 2006). The Third Circuit noted that, subsequent to this Court's January 2002 decision on the Motion for Summary Judgment, the United States Supreme Court had issued a ruling in Jackson v. Birmingham Bd. of Ed., 544 U.S. 167 (2005), which held that Title IX's private right of action encompassed claims of retaliation against an individual. Atkinson, 460 F.3d at 451-52. Accordingly, the Third Circuit vacated the dismissal of Plaintiff's Title IX retaliation claim and remanded it back to this

16

Court for further proceedings consistent with Jackson. Id.

Following additional discovery, Defendant Lafayette College filed the present Motion for Summary Judgment as to Count III. The Motion alleges that Plaintiff has failed to produce sufficient evidence to support a *prima facie* case that her dismissal from employment was in retaliation for opposition to practices made unlawful by Title IX. Further, it alleges that Plaintiff neglected to raise a genuine issue of material fact that the College President's reasons for her dismissal were untrue and, instead, a pretext for Title IX retaliation. Plaintiff responded on March 23, 2009, and Defendant filed a Reply Brief on April 27, 2009. The Court now turns to a discussion of this remaining issue.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. County of Allegheny, Pa, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning
Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by
both sides, the court must accept as true the allegations of the non-moving party, and "all
justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine
issue of material fact, it need not "support its motion with affidavits or other similar materials
negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet
its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving
party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party
"must do more than simply show that there is some metaphysical doubt as to material facts."
Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a
verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly
probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777
(3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d
231 (3d Cir. 1999).

## III.   DISCUSSION

As noted above, this suit's sole remaining count involves Plaintiff's allegation of
retaliation based on her activity under Title IX. Title IX provides that "[n]o person in the United
States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or
be subjected to discrimination under any education program or activity receiving Federal
financial assistance." 20 U.S.C. § 1681(a). In other words, it bars sex discrimination by
recipients of federal education funding. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173

18

(2005). In 2005, the United States Supreme Court explicitly determined that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment." Id. at 173-74. Accordingly, the Supreme Court held that "when a funding recipient retaliates against a person *because* he complains of sexual discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." Id. at 174 (emphasis in original).

"In allowing claims for retaliation under Title IX, the Supreme Court has nonetheless neglected to provide a scheme by which they may be analyzed." Dawn L. v. Greater Johnstown Sch. Dist., Civ. A. No. 06-19, 2008 WL 2620170, at *4 (W.D. Pa. Jul. 2, 2008). Following the Supreme Court's lead in turning to Title VII jurisprudence for Title IX cases, lower courts have adopted the Title VII framework to analyze Title IX retaliation claims. Id. (citing Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 616 (1999)) (further citations omitted). Under Title VII jurisprudence, a plaintiff must first establish a *prima facie* case of retaliation, which involves a three-prong test showing that: (1) the plaintiff engaged in protected activity; (2) the plaintiff experienced a materially adverse action either after or contemporaneously with the protected activity; and (3) there was a causal link between the protected activity and the adverse action. Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d 332, 374 (W.D. Pa. 2008) (citing Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001)); see also Theriault v. Dollar General, Civ. A. No. 08-2653, 2009 WL 1922199, at *1 (3d Cir. Jul. 6, 2009).

If a plaintiff can satisfy the three elements of the *prima facie* case, then the subsequent

19